# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STEVEN MELTON,

*Plaintiff-Appellant,*

v.

CITY OF FORREST CITY, ARKANSAS; CEDRIC WILLIAMS,
in his official and individual capacities,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of Arkansas, No.3:21-cv-194-DPM

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## STEVEN MELTON

David R. Hogue
Chris Corbitt
HOGUE & CORBITT
700 S. German Lane, Suite 104
Conway, AR 72034
(501) 255-0112
dh@hoguecorbittward.com
chris@hoguecorbittward.com


January 25, 2024

J. Michael Connolly
Frank H. Chang*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
frank@consovoymccarthy.com


*\*Supervised by principals of the firm admitted
to practice in Virginia*

*Counsel for Plaintiff-Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Americans don't lose their First Amendment rights just because they work for the government. But Steven Melton was fired for exercising his freedom of speech. Melton had an unblemished record as a firefighter. As a Christian, Melton believes that abortion is wrong. He shared his pro-life views by posting a powerful image showing the grim reality of abortion on his personal Facebook account. But the Facebook post was misunderstood by some who viewed it, prompting a handful of citizens to contact Mayor Cedric Williams to complain about it. Although Melton had deleted the post immediately upon learning about the misunderstanding, Mayor Williams fired him.

This appeal raises three important issues concerning Melton's First Amendment right to comment on an issue of great public concern, outside of work, as a private citizen. ***First***, whether Defendants can fire Melton when they conceded that his speech (and the controversy surrounding it) did not cause any disruptions to the fire department or disharmony among firefighters, and only offered hearsay evidence about unidentified individuals who complained about Melton's post based on a mistaken belief about its meaning. ***Second***, whether Defendants have an unwritten speech policy that gives unbridled discretion to City officials to punish employees for posting what City officials consider to be "egregious." ***Third***, whether both Mayor Williams and the City are liable because the Mayor violated Melton's rights, making him personally liable, and acted as the City's final policymaker, making the City liable.

Melton requests 20 minutes of oral argument for these issues.

i

# TABLE OF CONTENTS

Summary of the Case and Request for Oral Argument ...................................... i

Table of Authorities ...................................................................... iv

Jurisdictional Statement ................................................................... 1

Statement of the Issues ................................................................... 1

Statement of the Case .................................................................... 2

    I.    Motivated by his religious belief, Melton shares his pro-life views on his personal Facebook page ........................................................ 2

    II.   Mayor Williams suspends—and later fires—Melton from the firefighter position after his pro-life Facebook post generates misunderstanding about its meaning. ............................................................ 6

    III.  Melton sues the City and Mayor Williams to vindicate his constitutional rights. ............................................................................. 10

Summary of Argument .................................................................. 13

Argument ............................................................................... 16

    I.    Melton is entitled to summary judgment on his First Amendment retaliation claim. ..................................................................... 16

        A.    Melton spoke on a matter of public concern by sharing a pro-life Facebook post. ................................................................. 19

        B.    Defendants failed to proffer sufficient evidence of actual or likely disruptions to put *Pickering* balancing at issue. ...................................... 22

        C.    Even under *Pickering* balancing, Melton's interests significantly outweigh Defendants' interests. ........................................... 35

        D.    Alternatively, the district court should have submitted the factual predicates to *Pickering* balancing to the jury. ..................................... 39

    II.   Melton is entitled to summary judgment on his unbridled-discretion claim. ................................................................................ 41

        A.    Defendants conceded that the Mayor enforces an unwritten policy of scrutinizing employee speech for egregiousness on a case-by-case basis. ..................................................................... 41

        B.    Defendants' unwritten policy prohibiting egregious social media posts gives unbridled discretion to censor and punish speech. ......... 43

Appellate Case: 23-3398    Page: 3    Date Filed: 01/25/2024    Entry ID: 5356956

III.  Neither the City nor Mayor Williams can escape liability for money damages or equitable relief. ........................................................ 47

    A.  Mayor Williams does not enjoy qualified immunity. ......................... 47

    B.  The City is liable for Mayor Williams's actions. .................................. 47

Conclusion ................................................................................................................ 51

Certificate of Compliance ..................................................................................... 52

Certificate of Service ............................................................................................. 52

Appellate Case: 23-3398    Page: 4    Date Filed: 01/25/2024 Entry ID: 5356956

# TABLE OF AUTHORITIES

## Cases

*Adams v. Trs. of the Univ. of N.C.-Wilmington*,
640 F.3d 550 (4th Cir. 2011) ....................................................22

*Angarita v. St. Louis County*,
981 F.2d 1537 (8th Cir. 1992) ............................................... 47, 48

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*,
793 F.3d 822 (8th Cir. 2015) ...................................26, 28, 35

*Belk v. City of Eldon*,
228 F.3d 872 (8th Cir. 2000) ...............17, 23, 24, 25, 26, 35, 40

*Bennett v. Metro. Gov't of Nashville*,
977 F.3d 530 (6th Cir. 2020) ....................................................33

*Bresnahan v. City of St. Peters*,
58 F.4th 381 (8th Cir. 2023) ............................................. 17, 19

*Burnham v. Ianni*,
119 F.3d 668 (8th Cir. 1997) .................18, 23, 24, 25, 27, 32, 37

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................................................19

*Cochran v. City of Atlanta*,
289 F. Supp. 3d (N.D. Ga. 2017) ................................ 1, 45

*Connick v. Myers*,
461 U.S. 138 (1983) ............................................17, 19, 21

*Crawford v. Columbus State Cmty. Coll.*,
196 F. Supp. 3d (S.D. Ohio 2016)....................................22

*Cutler v. Stephen F. Austin State Univ.*,
767 F.3d 462 (5th Cir. 2014) ....................................................28

iv

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ................................................................ 20, 21

*Dodge v. Evergreen Sch. Dist. #114*,
  56 F.4th 767 (9th Cir. 2022) .................................................. 31

*EMW Women's Surgical Ctr., PSC v. Beshear*,
  920 F.3d 421 (6th Cir. 2019) .................................................. 20

*Fed. Ins. Co. v. Great Am. Ins. Co.*,
  893 F.3d 1098 (8th Cir. 2018) ............................................... 16

*Fenico v. City of Philadelphia*,
  70 F.4th 151 (3d Cir. 2023) ............................... 17, 22, 23, 26

*Forsyth County, Ga. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................ 46

*Frederick Douglass Found. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023) ........................................ 20, 21

*Fuller v. Warren Cnty. Educ. Serv. Ctr.*,
  2022 WL 445815 (S.D. Ohio Feb. 14, 2022) ......................... 33

*Glossip v. Gross*,
  576 U.S. 863 (2015) ................................................................ 21

*Gordon v. City of Kansas City*,
  241 F.3d 997 (8th Cir. 2001) .................................................. 17

*Goza v. Memphis Light, Gas & Water Div.*,
  398 F. Supp. 3d (W.D. Tenn. 2019) ....................................... 33

*Grantham v. Trickey*,
  21 F.3d 289 (8th Cir. 1994) .................................................... 24

*Johnston v. Koppes*,
  850 F.2d 594 (9th Cir. 1988) ......................................... 21, 22, 23

*Jones v. Salt Lake County*,
  503 F.3d 1147 (10th Cir. 2007) ......................................... 41, 42

v

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ..........................................................16, 27, 33

*Kentucky v. Graham,*
  473 U.S. 159 (1985) .......................................................................47

*Kincade v. City of Blue Springs, Mo.,*
  64 F.3d 389 (8th Cir. 1995) ...........................16, 17, 18, 24, 26, 37

*Kinney v. Weaver,*
  367 F.3d 337 (5th Cir. 2004) ....................................................27, 31

*Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988) .......................................................................44

*Lane v. Franks,*
  573 U.S. 238 (2014) .......................................................................16

*Lewis v. Wilson,*
  253 F.3d 1077 (8th Cir. 2001) .............................................1, 44, 45, 46

*Lindsey v. City of Orrick,*
  491 F.3d 892 (8th Cir. 2007) ........................................................31

*Liverman v. City of Petersburg,*
  844 F.3d 400 (4th Cir. 2016) ........................................................33

*Locurto v. Giuliani,*
  447 F.3d 159 (2d Cir. 2006) .....................................................30, 34

*Lytle v. Carl,*
  382 F.3d 978 (9th Cir. 2004) ........................................................48

*MKB Mgmt. Corp. v. Stenehjem,*
  795 F.3d 768 (8th Cir. 2015) ........................................................21

*McMullen v. Carson,*
  754 F.2d 936 (11th Cir. 1985) ......................................................34

*Meier v. City of St. Louis, Mo.,*
  934 F.3d 824 (8th Cir. 2019) ....................................................41, 47

Appellate Case: 23-3398     Page: 7     Date Filed: 01/25/2024 Entry ID: 5356956

*Melzer, Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.C.,*
    336 F.3d 185 (2d Cir. 2003) ................................................................32

*Moser v. Las Vegas Police Dep't,*
    984 F.3d 900 (9th Cir. 2021) ....................................23, 26, 31, 34, 38, 40, 41

*Munroe v. Cent. Bucks Sch. Dist.,*
    805 F.3d 454 (3d Cir. 2015) ................................................................33

*NAACP v. City of Philadelphia,*
    39 F. Supp. 3d (E.D. Pa. 2014) ........................................................ 42, 43

*Naucke v. City of Park Hills,*
    284 F.3d 923 (8th Cir. 2002) ............................................................ 16, 17

*Nichols v. Dancer,*
    657 F.3d 929 (9th Cir. 2011) ................................................................27

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986) ..........................................................................49

*Pickering v. Bd. of Educ. Twp. High Sch. Dist.,*
    391 U.S. 563 (1968) ................................................... 1, 16, 25, 30, 33, 34, 37

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ....................................................................16, 23, 36

*Riley's Am. Heritage Farms v. Elsasser,*
    32 F.4th 707 (9th Cir. 2022) ..........................................23, 30, 32, 34, 36

*Roach v. Stouffer,*
    560 F.3d 860 (8th Cir. 2009) ........................................................ 1, 44, 45, 46

*Rossignol v. Voorhaar,*
    316 F.3d 516 (4th Cir. 2003) ................................................................40

*Sexton v. Martin,*
    210 F.3d 905 (2000) ...............................1, 17, 18, 22, 23, 24, 25, 26, 29, 30, 31, 32, 36

Appellate Case: 23-3398    Page: 8    Date Filed: 01/25/2024    Entry ID: 5356956

*Shands v. City of Kennett,*
   993 F.2d 1337 (8th Cir. 1993) ........................................................ 28, 29, 36, 40

*Shockency v. Ramsey County,*
   493 F.3d 941 (8th Cir. 2007) ..............................................................25, 37, 47

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ...........................................................................................23

*Sotecz v. Rushmore Plaza Civc Ctr.,*
   847 F.3d 941 (8th Cir. 2017) ...................................................................... 1, 48

*St. Luke Methodist Hosp. v. Thompson,*
   182 F. Supp. 2d 765 (N.D. Iowa 2001) ..........................................................40

*Stenberg v. Carhart,*
   530 U.S. 914 (2000) ...........................................................................................21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ...........................................................................................27

*Washington v. Normandy Fire Prot. Dist.,*
   272 F.3d 522 (8th Cir. 2001) ..............................................................29, 37, 41

*Waters v. Churchill,*
   511 U.S. 661 (1994) ...........................................................................................24

*Wermager v. Cormorant Twp. Bd.,*
   716 F.2d 1211 (8th Cir. 1983) ..........................................................................40

*Williams v. Butler,*
   863 F.2d 1398 (8th Cir. 1988) ..........................................................................48

## Constitution and Statutes

28 U.S.C. §1291 ...........................................................................................................1

28 U.S.C. §1331 ...........................................................................................................1

28 U.S.C. §1367 ...........................................................................................................1

Appellate Case: 23-3398    Page: 9    Date Filed: 01/25/2024 Entry ID: 5356956

28 U.S.C. §1441 .................................................................................................1

42 U.S.C. §1983 ................................................................................41, 47, 48

Ark. Const. art. 12, §4 ...................................................................................50

Ark. Stat. Ann. §14-43-504 ...................................................................... 48, 49

Ark. Stat. Ann. §14-53-101 ...........................................................................49

Forrest City Ord. §2-23 ..................................................................................50

Forrest City Ord. §2-24 ..................................................................................50

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................40

Fed. R. Evid. 201(b) .........................................................................................5

**Other Authorities**

Ark.-A.G. Op. No. 2002-206, 2002 WL 2005942 (Aug. 22, 2002)...................49

Ark.-A.G. Op. No. 2012-084, 2012 WL 3078118 (July 25, 2012) ...................50

DOD, *Defense Department Observes National POW/MIA Recognition Day*
(Sept. 16, 2021), bit.ly/3tZo1ze........................................................................5

Appellate Case: 23-3398    Page: 10    Date Filed: 01/25/2024 Entry ID: 5356956

# JURISDICTIONAL STATEMENT

The district court had jurisdiction after Defendants removed the case from state court under 28 U.S.C. §1441, because Melton's complaint raised federal claims for which there was jurisdiction under 28 U.S.C. §1331 and state claims for which there was jurisdiction under 28 U.S.C. §1367. App.2. This Court has appellate jurisdiction to review the district court's final judgment entered on September 29, 2023. 28 U.S.C. §1291. Melton timely appealed on October 27, 2023. App.158-60; R Doc.38.

# STATEMENT OF THE ISSUES

I.      Whether Melton is entitled to summary judgment on his First Amendment retaliation claim when Defendants fired Melton because of minor occurrences of complaints based on a misunderstanding about the post, even though Melton's post caused no disruptions to the fire department or disharmony among firefighters. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Sexton v. Martin*, 210 F.3d 905 (2000).

II.     Whether Melton is entitled to summary judgment on his unbridled-discretion claim challenging Defendants' unwritten social media policy of terminating employees for what the Mayor considers to be "egregious" posts. *See, e.g., Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009); *Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001); *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1279 (N.D. Ga. 2017).

III.    Whether both Mayor Williams and the City are liable. *See, e.g., Sexton*, 210 F.3d 905; *Sotecz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941 (8th Cir. 2017).

Appellate Case: 23-3398      Page: 11      Date Filed: 01/25/2024 Entry ID: 5356956

## STATEMENT OF THE CASE

Melton had an unblemished record as a firefighter. He shared a powerful image containing his pro-life views on his personal Facebook account. But this Facebook post was misunderstood by some who viewed it. Immediately upon learning about the misunderstanding, Melton deleted the post. Mayor Williams received a media request and complaints from some unidentified individuals about Melton's Facebook post. It's undisputed that Melton's Facebook post, and the controversy surrounding it, did not disrupt the fire department's ability to put out fires, conduct training, and carry out its operations. None of Melton's firefighter colleagues complained about the post. Mayor Williams still fired Melton.

## I.   Motivated by his religious belief, Melton shares his pro-life views on his personal Facebook page.

Melton dedicated his professional life to serving others as a sheriff's deputy and a firefighter. Before Melton became a firefighter, he worked as a sheriff's deputy for nearly seven years in St. Francis County (where Forrest City is located) and Faulkner County. App.76-77; R. Doc.21-4, at 1-2 (Melton 16:2-17:7). Melton was hired by the Forrest City Fire Department in January 2016. App.100; R. Doc.24-3, at 4 (Melton 13:1). Melton explained that the City pays about double in salary for its firefighters what St. Francis County pays for its sheriff's deputies, with better retirement benefits. App.101; R. Doc.24-3, at 5 (Melton 18:19). Melton planned to stay on with the fire department for the rest of his career, training to become a fire marshal and planning to someday retire as a firefighter. App.77; R. Doc.21-4, at 2 (Melton 17:16-20). He was a

Appellate Case: 23-3398   Page: 12   Date Filed: 01/25/2024 Entry ID: 5356956

"good firefighter" and "[h]is personnel record was unblemished." App.149; R. Doc.36, at 3.

Melton is a devout Christian. App.148; R. Doc.36, at 2. And like millions of his fellow Americans, he believes that abortion ends an innocent human life. App.109; R. Doc.24-3, at 13 (Melton 51:15-24). He also believes that it's wrong to kill the baby in the womb. App.108; R. Doc.24-3, at 12 (Melton 45:2-7).

In June 2020, Melton saw a post being shared by another person on Facebook. App.108; R. Doc.24-3, at 12 (Melton 44:13-19). Melton did not personally know the person sharing it. *Id.* Melton believed the post conveyed a pro-life message. App.78; R. Doc.21-4, at 3 (Melton 26:13-22). Melton also shared that post on his personal Facebook account to convey his pro-life belief. *Id.*; App.83; R. Doc.21-4, at 8.

Appellate Case: 23-3398    Page: 13    Date Filed: 01/25/2024 Entry ID: 5356956



As Melton later explained, the silhouette of the infant was styled similarly to the silhouette of the prisoner in the well-known POW/MIA flag. App.108; R. Doc.24-3, at 12 (Melton 47:4-7).[1] George Floyd had died in May 2020, and the phrase "I can't breathe"

---

[1] The POW/MIA flag is flown in remembrance of the prisoners of wars and servicemembers who went missing in action:



Appellate Case: 23-3398    Page: 14    Date Filed: 01/25/2024 Entry ID: 5356956

was associated with his death. *See* App.109-10; R. Doc.24-3, at 13-14 (Melton 51:25-52:6). Melton intended this statement to convey the fact that when "you kill the baby, they can't breath[e] anymore." App.109; R. Doc.24-3, at 13 (Melton 51:21-24). At this time, Melton's personal Facebook account could be viewed by the public. App.82; R. Doc.21-4, at 7 (Melton 31:19-21).

On June 24, 2020, Melton received a call from a former colleague, retired fire captain Marvin Dale. App.80-81; R. Doc.21-4, at 5-6 (Melton 29:9-30:1). Dale told Melton that he found his Facebook post offensive, misunderstanding the post to depict a rope draped around a black baby. *Id.* Melton explained to Dale that it was a silhouette of an infant in the womb, not a black baby. *Id.* Dale told Melton that, before talking to Melton, he "'at first… thought it was offensive to [him], because [he] assumed that it was … just a black baby.'" App.109; R. Doc.24-3, at 13 (Melton 50:13-18). After Melton "explained the post," Dale said he understood. App.108; R. Doc.24-3, at 12 (Melton 46:24-47:3). Out of respect for Dale, Melton told him that he would delete the Facebook post, which he did within minutes of ending his phone call with Dale. *Id.* Melton also later testified that he does not "have any problem taking anything down if it offends [others]." App.78; R. Doc.21-4, at 3 (Melton 26:10-12). Melton did not hear from anyone else—including his current firefighter colleagues—about this Facebook post until his meeting with the Mayor the next day. App.81; R. Doc.21-4, at 6 (Melton 30:4-7)

DOD, *Defense Department Observes National POW/MIA Recognition Day* (Sept. 16, 2021), bit.ly/3tZo1ze; *see also* Fed. R. Evid. 201(b).

Appellate Case: 23-3398    Page: 15    Date Filed: 01/25/2024 Entry ID: 5356956

## II. Mayor Williams suspends—and later fires—Melton from the firefighter position after his pro-life Facebook post generates misunderstanding about its meaning.

On June 25, Melton received a phone call from his fire chief, Shane Dallas. App.81; R. Doc.21-4, at 6 (Melton 30:8-18). Chief Dallas told Melton to meet him at Mayor Williams's office. *Id.* Mayor Williams became aware of Melton's Facebook post on that day because "[s]ome citizens" and "Chief Dallas" sent it to him. App.121; R. Doc.24-10, at 5 (Williams 19:3-15). Mayor Williams found the picture offensive because he thought it was depicting a "a noose around a Black baby's neck." *Id.*

Melton asked Chief Dallas what the meeting was about. App.82; R. Doc.21-4, at 7 (Melton 31:1-18). Chief Dallas said, "I guess it's about your Facebook post." *Id.* Mayor Williams also asked Melton if he knew "why we're here." *Id.* When Melton said he "assume[d] [it was] for the Facebook post," Mayor Williams confirmed that it was. *Id.* As Mayor Williams later testified, the City has a personnel policy manual and a social media policy. App.124; R. Doc.24-10, at 8 (Williams 29:6-16). These policies, however, do not prohibit City employees from having social media accounts or even from sharing controversial posts. *Id.*; App.127; R. Doc.24-10, at 11 (Williams 41:11-14); *see* App.130; R. Doc.24-10, at 14 (Williams 55:22-25). Nor do they describe what a City employee can or can't post. App.124; R. Doc.24-10, at 8 (Williams 29:6-16).

The meeting occurred around 4 p.m. App.81; R. Doc.21-4, at 6 (Melton 30:14-18). Melton was "very … apologetic" that he had offended people. App.57; R. Doc.21-3 (Williams 24:3-11). He tried to explain his Facebook post, what he and Dale discussed

6

in their phone call, and that he deleted the Facebook post. App.82; R. Doc.21-4, at 7 (Melton 31:4-13). Mayor Williams still placed Melton on administrative leave pending further investigation, and Melton went home. *Id.* The Mayor's "investigation" consisted of talking to Chief Dallas, two retired firefighters, lawyers, and an HR personnel. App.59; R. Doc.21-3, at 6 (Williams 26:14-19); App.148-49; R. Doc.36, at 2-3.

The next morning, on June 26, 2020, Chief Dallas came to see Melton at his house. App.105; R. Doc.24-3, at 9 (Melton 33:23-35:9). Chief Dallas told Melton that Mayor Williams wanted his resignation. *Id.* Melton said he would not resign. *Id.* Later that night, Melton learned of his firing through Channel 3—an out-of-town, Memphis-based news outlet—which reported that the City fired him over "a controversial Face-book post." *Id.*; App.109; R. Doc.24-3, at 13 (Melton 48:2-3). The City officials had not notified Melton of his firing by this point. App.105; R. Doc.24-3, at 9 (Melton 33:23-35:9). Mayor Williams testified that he notified the press because he was "fulfilling a media request." App.125; R. Doc.24-10, at 9 (Williams 34:12). Mayor Williams testified that he is not aware of "any other media coverage … since the beginning." App.135; R. Doc.24-10, at 19 (Williams 72:3-7).

On June 29, 2023, Mayor Williams released a separate press release stating that the City fired a "Forrest City Fire Fighter" due to "[q]uestionable social media posts." App.96; R. Doc.24-2, at 1. When the termination letter finally arrived to Melton, Mayor Williams wrote: "Pursuant to our conversation on 6-25-2020 when you were placed on paid administrative leave for the investigation into the incident that was brought to light

7

on 6-25-2020[,] … I have decided to terminate your employment immediately as of 6/26/2020 from the City of Forrest City[,] Arkansas." App.113; R. Doc.24-6, at 1.

Although Mayor Williams testified that Chief Dallas's phone was "blowing up" and the Mayor received calls from City Councilmembers and about 20 to 25 unidentified individuals about Melton's post over a two-week period, the timing of those calls is unclear (i.e., pre-termination or post-termination). App.130; R. Doc.24-10, at 14 (Williams 53:18-54:11); App.135; R. Doc.24-10, at 19 (Williams 75:19-21). Mayor Williams testified that some of these calls were received "three to five days after the termination" (which is also after the Channel 3 news coverage aired). App.130; R. Doc.24-10, at 14 (Williams 53:18-54:11). Mayor Williams observed that City Councilmembers were doing TV broadcast in the City Hall parking lot and said that he was asked to not send Melton on emergency calls in the calls he received. *Id.*

Despite all this, Mayor Williams testified that Melton's Facebook post had no effect on the fire department's day-to-day operations "[d]uring any time frame." App.69; R. Doc.21-3, at 16 (Williams 69:10-15). Namely, it did not prevent the fire department from putting out fires, conducting trainings, or carrying out its operations. *Id.*; App.67; R. Doc.21-3, at 14 (Williams 54:22-25). Although Mayor Williams said he visited with his police chief who said that some police officers were upset about Melton's post, the timing of that visit is unclear, and he confirmed that Melton's post did not prevent the City from making any arrests. App.66-67; R. Doc.21-3, at 13-14 (Williams 53:19-54:11). And none of Melton's firefighter colleagues reached out to Melton

8

to talk to him about the post. App.155; R. Doc.36, at 9; *see* App.81; R. Doc.21-4, at 6 (Melton 30:6-7). Although Mayor Williams testified that he consulted two retired firefighters during his investigation before firing Melton, there's no evidence that any current firefighters complained about the Facebook post to Chief Dallas or Mayor Williams. App.155; R. Doc.36, at 9. Nevertheless, Mayor Williams concluded that "the egregious nature" of the Facebook post justified firing Melton. App.60; R. Doc.21-3, at 7 (Williams 28:13-19). He agreed that Melton had not violated "any rule or regulation of the [City's] personnel policy handbook." App.126; R. Doc.24-10, at 10 (Williams 37:19-21).

On July 3, 2020, Melton wrote a grievance letter to Mayor Williams. App.73; R. Doc.21-3, at 20. Melton explained that he had "served this community for many years without incident." *Id.* He explained that his "anti-abortion post was an expression of [his] Religious Freedoms and speaking out against public concern." *Id.* Nevertheless, Melton's "intention with the post was not taken into consideration." *Id.* Melton also pointed out that he "did not violate any Rule or Regulation in the Personnel Policy Handbook." *Id.* On July 8, the Mayor said he "reviewed the facts of the investigation" but upheld "the termination determination." App.74; R. Doc.21-3, at 21. On July 14, Melton appealed his decision again, reiterating his grievance statements. App.75; R. Doc.21-3, at 22. Mayor Williams, however, did not respond. App.106; R. Doc.24-3, at 10 (Melton 38:8-9).

Appellate Case: 23-3398    Page: 19    Date Filed: 01/25/2024 Entry ID: 5356956

Melton is currently back to working as a sheriff's deputy for St. Francis County. App.98-99; R. Doc.24-3, at 2-3 (Melton 7:21-8:12). As part of his job, he goes on patrols, takes calls, and comes into regular contact with the public. *Id.* Mayor Williams testified that "[a]nything is … available for … consideration and talking" if Melton requested "to get his job back as a firefighter." App.135; R. Doc.24-10 (Williams 72:10-15).

### III. Melton sues the City and Mayor Williams to vindicate his constitutional rights.

On August 17, 2021, Melton sued the City and Mayor Williams in the Circuit Court of St. Francis County, Arkansas, alleging violations of his federal and state constitutional rights. App.2. As relevant to this appeal, Melton alleged that Defendants retaliated against him for exercising his freedom of speech by sharing his pro-life views on Facebook. App.9-11; R. Doc.2, at 5-7 (¶¶51-76). Melton also alleged that Defendants enforce an unwritten policy that gives an unbridled discretion to City officials to censor and punish employee speech. App.11-14; R. Doc.2, at 7-10 (¶¶77-105). Melton sought, among other things, reinstatement as a Forrest City firefighter, a declaratory judgment that Defendants violated his rights, an injunction barring the enforcement of the unwritten policy, and money damages.

On September 16, 2021, Defendants removed the case to the U.S. District Court for the Eastern District of Arkansas. App.2. After fact discovery, the parties cross-moved for summary judgment. Melton moved for summary judgment as to his

retaliation and unbridled-discretion claims. App.45-46; R. Doc.21, at 1-2. Defendants also moved, seeking dismissal of all claims. App.84; R. Doc.22, at 1-2.

On September 23, 2023, the district court issued an order granting Defendants' motion for summary judgment, denying Melton's motion, and dismissing the case. App.147-56; R. Doc.36, at 1-10.

The district court described what it viewed to be undisputed facts. Melton shared the Facebook post "to express his anti-abortion views." App.148; R. Doc.36, at 2. Although Dale, the retired fire captain, contacted Melton about the post, "[n]o one else connected with the fire department responded to [him]." *Id.* "[T]here was no disruptions of training at the fire department, or of any fire services calls, because of the post or the controversy surrounding it." *Id.*

The district court held that the municipal claim against the City and the official-capacity claim against Mayor Williams failed because "[t]here's no evidence in the record of a Forrest City policy or custom with the force of law about controversial speech by city employees." App.149; R. Doc.36, at 3. The court also concluded that Melton's unbridled-discretion claim failed because Melton "hasn't met his burden of showing a real and substantial deterrent effect on protected expression." App.150; R. Doc.36, at 4.

As to Melton's "individual-capacity First Amendment retaliation" claim, the district court proceeded under the *Pickering* framework. App.151; R. Doc.36, at 5. The district court held that it was undisputed that Mayor Williams fired Melton "at least in

11

part" because of his Facebook post. App.152; R. Doc.36, at 6. The only question was "[w]hether Melton engaged in a protected activity." *Id.* The court agreed that Melton spoke "as a citizen on a matter of public concern" when he shared his pro-life Facebook post. *Id.* Next, the district court assessed whether Mayor Williams "produce[d] evidence showing that Melton's speech had an adverse impact on Forrest City's operations." App.153; R. Doc.36, at 7. Although the court acknowledged that there was "no actual disruptions to fire department training or service calls," it held that "[g]iven all the fuss that did occur, [it] [would] defer[] to Mayor Williams's conclusion that Melton's speech would cause disruption in the fire department." App.153-54; R. Doc.36, at 7-8. Next, the court balanced these interests. The district court observed that *Pickering* balancing was "close" in this case. App.155; R. Doc.36, at 9. Nevertheless, the district court deferred to Mayor Williams and held that the balancing favored him. *Id.*

Melton timely appealed.

## SUMMARY OF ARGUMENT

American citizens do not lose their First Amendment rights just because they work for the government. The district court erred in granting summary judgment in Defendants' favor. Melton is entitled to summary judgment as to his retaliation and unbridled-discretion claims. And contrary to the district court's conclusion, neither qualified immunity nor the municipal-liability doctrine bars Melton's claims. This Court should reverse the district court's order granting summary judgment in Defendants' favor, grant summary judgment in Melton's favor, and remand for further proceedings. Alternatively, this Court should vacate and remand with instructions for the district court to submit various factual disputes to the jury.

**I.** Melton should prevail on his First Amendment retaliation claim under *Pickering*. Here, the only element at issue on appeal is whether Melton engaged in protected activity when he shared the pro-life Facebook post. He did.

Melton spoke, as a private citizen, outside of work, on a matter of public concern by sharing his pro-life views on abortion. The nature of Melton's speech imposes a greater burden on the government in justifying Melton's firing because the speech commented on a politically, socially, and morally significant issue. Defendants failed to put *Pickering* balancing at issue by proffering sufficient evidence of actual or likely disruptions proportional to the nature of Melton's speech. Defendants cannot meet this high threshold because they conceded that Melton's Facebook post (despite being misunderstood by some) caused no actual disruptions to fire services or disharmony among

13

Melton's firefighter colleagues. The district court erred in effectively giving dispositive weight to Defendants' mere allegation of disruptions and hearsay evidence regarding unidentified individuals' discontentment with the post based on misunderstanding. Even if *Pickering* balancing is required, Melton's First Amendment interests in sharing his pro-life views as a private citizen significantly outweigh Defendants' interests.

Alternatively, the district court should have submitted material fact disputes to the jury before proceeding to *Pickering* balancing. At a minimum, viewing the evidence in the light most favorable to Melton, there was a fact dispute as to whether Defendants had a reasonable belief of likely disruptions. This question should have been resolved by the jury.

**II.** Melton should prevail on his unbridled-discretion claim. Throughout his deposition, Mayor Williams confirmed the existence of an unwritten policy under which he scrutinizes employee speech on a case-by-case basis and fires employees whose speech he considers to be egregious. The First Amendment prohibits speech policies that give unbridled discretion to government officials to censor and punish speech. To prevail on a facial challenge on this ground, the plaintiff does not need to show that the government official has in fact exercised his discretion in a content-based manner. He only needs to show that there is nothing in the challenged policy that prevents him from doing so. Defendants' unwritten social media policy provides no standard to define what constitutes "egregious" speech that City officials would censor and punish. Instead, it provides unfettered discretion to City officials. Because nothing prevents City

officials from exercising their discretion in a content- or viewpoint-discriminatory manner, Melton should prevail on his unbridled-discretion claim.

**III.** Neither Mayor Williams nor the City may escape liability. The district court's qualified immunity holding turned on its conclusion that Melton's firing was justified. If this Court reverses the district court on that ground, it should also reverse on the qualified immunity holding. The City also cannot escape municipal liability. Contrary to the district court's conclusion, the City's policies can be inferred from Mayor Williams's decisions as he was the City's final policymaker for (1) promulgating and (2) enforcing personnel policies.

## ARGUMENT

This Court reviews the district court's decision on cross-motions for summary judgment de novo. *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018). Melton is entitled to summary judgment on his retaliation and unbridled-discretion claims. At a minimum, the jury should decide the disputed facts.

## I. Melton is entitled to summary judgment on his First Amendment retaliation claim.

Firefighters "do not surrender their First Amendment rights" just because they work for the government. *Lane v. Franks*, 573 U.S. 238, 231 (2014); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). The First Amendment requires courts to balance an employee's interests as a private citizen to comment on matters of public concern against the government's interests as an employer in promoting the efficiency of the public services. *Pickering v. Bd. of Educ. Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968).

A government employer "may not discharge an employee on a basis that infringes [upon] that employee's constitutionally protected interest in freedom of speech." *Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 395 (8th Cir. 1995) (quoting *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)). To prevail on a First Amendment retaliation claim, the plaintiff must show: (1) he engaged in protected activity; (2) the defendant took an adverse action that caused an injury which would chill a person of ordinary firmness from continuing the activity; and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Naucke v. City of Park Hills*, 284

16

F.3d 923, 927-28 (8th Cir. 2002). Here, because the district court held that "[t]he second and third elements are agreed," App.152; R. Doc.36, at 6, only whether Melton engaged in protected activity is at issue on this appeal.

Determining whether the employee's speech is protected is a question of law, but it "requires a robust factual basis, given that *Pickering* sets forth a uniquely 'particularized' balancing test, not a simple burden-shifting threshold." *Fenico v. City of Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2023); *see also Gordon v. City of Kansas City*, 241 F.3d 997, 1003 (8th Cir. 2001) ("[A]ny underlying facts that are in material and in genuine dispute must be submitted to a fact finder.").

To assess whether an employee engaged in protected activity, this Court applies a two-step inquiry. At the first step, this Court determines whether the employee spoke on "'a matter of public concern'" as a private citizen. *Kincade*, 64 F.3d at 395 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *accord Bresnahan v. City of St. Peters*, 58 F.4th 381, 384 (8th Cir. 2023). "The more the employee's speech reflects matters of public concern, the greater the employer's showing must be that the speech was disruptive before the speech can be punished." *Sexton v. Martin*, 210 F.3d 905, 912 (2000).

If the speech involves a matter of public concern, this Court proceeds to the second step where the burden shifts to the government. The second step seeks to balance the employee's right to free speech against the interests of the public employer. *Sexton*, 210 F.3d at 910. The second step consists of both (1) a "threshold inquiry" and (2) the *Pickering* balancing test. *Belk v. City of Eldon*, 228 F.3d 872, 881 (8th Cir. 2000).

17

Under the threshold inquiry—before commencing *Pickering* balancing—the government employer must "proffer sufficient evidence that the speech had an adverse effect on the efficiency of the employer's operations … to put the *Pickering* balancing test at issue." *Sexton*, 210 F.3d at 911-12. If the employer cannot make this showing, then "the *Pickering* balancing test is inapposite," *Burnham v. Ianni*, 119 F.3d 668, 678 (8th Cir. 1997), and courts may "properly decline[] to conduct the *Pickering* balancing test," *Kincade*, 64 F.3d at 398. If balancing is required, the government bears the burden to show that the balance tips in its favor." *Sexton*, 210 F.3d at 911-12.

Here, Melton's pro-life speech was protected.

**First**, Melton spoke, as a private citizen outside of work, on a matter of public concern by sharing his pro-life views on abortion.

**Second**, Defendants failed to put *Pickering* balancing at issue by proffering sufficient evidence of actual or likely disruptions proportional to the nature of Melton's speech. Melton's speech is entitled to great weight because it concerned a politically, socially, and morally significant issue, and Defendants needed to satisfy an even greater burden. Defendants cannot meet this high threshold because they conceded that Melton's Facebook post (despite being misunderstood by some) caused no actual disruption to fire services or disharmony among Melton's firefighter colleagues. The district court erred in effectively giving dispositive weight to Defendants' mere allegation of disruptions and hearsay evidence regarding unidentified individuals' discontentment with the post based on misunderstanding.

**Third**, even if *Pickering* balancing is required, Melton's First Amendment interests in sharing his pro-life views as a private citizen significantly outweigh Defendants' prediction of disruptions based on minor occurrences of third parties' misunderstanding Melton's post.

**Alternatively**, the district court should have submitted any material fact disputes to the jury before proceeding to *Pickering* balancing.

## A.  Melton spoke on a matter of public concern by sharing a pro-life Facebook post.

The first step of the *Pickering* analysis is easily met: Sharing pro-life views touches upon a matter of public concern. Speech involves a matter of public concern "when it 'relat[es] to any matter of political, social, or other concern to the community.'" *Bresnahan*, 58 F.4th at 385 (quoting *Connick*, 461 U.S. at 146). This Court examines the "'content, form, and context'" of the speech to determine whether it touched upon a matter of public concern. *Id.*

The content, form, and context of Melton's Facebook post demonstrate that his speech touched upon a matter of public concern. This Facebook post was intended to be a powerful message against abortion. *Supra* 3-5. This post was motivated by Melton's sincerely held religious belief that abortion is wrong, a common belief among many Americans. *Id.*; *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 700-01 (2014). On this point, the district court agreed with Melton that his speech touched upon a matter of public concern. App.152-53; R. Doc.36, at 6-7.

19

There are two features about the post that bear highlighting. ***First***, in addition to the well-known POW-MIA-flag style, the Facebook post shows a silhouette of a baby in the womb, evoking a sonogram picture of a baby in the womb. *See supra* 4. Sonograms have been commonly known to be a powerful pro-life message by themselves. They were "uncommon when *Roe* was decided." *EMW Women's Surgical Ctr., PSC v. Beshear*, 920 F.3d 421, 431 (6th Cir. 2019). But they are now ubiquitous, so much so that the "first picture[s]" of many in "the Gen-X, Millennial, and Gen-Z generations … commonly come[] from … sonogram[s]." *Id.* Since *Roe*—in part because of sonograms— many Americans came to "a new appreciation of fetal life." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 259 (2022). "[P]rospective parents … have no doubt that what they see is their daughter or son" when they "view a sonogram." *Id.* And many mothers may decide against abortion and choose life after seeing sonograms of their children. *See EMW*, 920 F.3d at 430-42 (sonograms may be "relevant to the [mother]'s decision whether to abort unborn life" and thus a critical part of obtaining informed consent).

***Second***, the picture comes with a caption that says "I can't breathe" along with a rope draped around the baby's neck. *Supra* 4. Melton testified that "[t]he statement 'I can't breathe'" conveys the message that when "you kill the baby, they can't breath[e] anymore." App.109; R. Doc.24-3, at 13 (Melton 51:21-24). This statement was also associated with George Floyd. But pro-life advocacy often tries to relate to a larger audience by adapting their message to coincide with current events. *Cf. Frederick Douglass*

Appellate Case: 23-3398     Page: 30     Date Filed: 01/25/2024 Entry ID: 5356956

*Found. v. District of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) (pro-life groups chalked "Black Pre-Born Lives Matter" similar to the familiar "Black Lives Matter" statement). To be sure, the rope is a provocative feature, but Melton believed that "[t]he whole image" conveyed his "anti-abortion" message. App.104; R. Doc.24-3, at 8 (Melton 28:19-21). And many Americans—like Melton—believe that abortion ends a human life. This belief often prompts them to associate abortion with death. *See, e.g.*, App.109; R. Doc.24-3, at 13 (Melton 51:21-24) (when "you kill the baby, they can't breath[e] anymore"); *Stenberg v. Carhart*, 530 U.S. 914, 920 (2000) ("Millions of Americans believe that life begins at conception and consequently that an abortion is akin to causing the death of an innocent child."); *cf. Glossip v. Gross*, 576 U.S. 863, 867 (2015) ("Hanging remained the standard method of execution through much of the 19th century.").

Melton's pro-life speech is entitled to significant weight for purposes of *Pickering*. Abortion is "a question of profound moral and social importance." *Dobbs*, 597 U.S. at 269. It divides "[t]he consciences of citizens." *Johnston v. Koppes*, 850 F.2d 594, 596 (9th Cir. 1988). It is also an issue that "the Constitution unequivocally leaves for the people" to decide how to address through the democratic process. *Dobbs*, 597 U.S. at 269. The ability to have a free and open debate about abortion was important in 2020 when Defendants fired Melton. *See MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 774-776 (8th Cir. 2015). It's even more important now as Americans work to persuade each other on the issue after *Dobbs. See Connick*, 461 U.S. at 145 (The First Amendment protects the

"'unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'").

Unsurprisingly, courts have uniformly found that "[a]bortion" is a matter of "great public concern." *Johnston*, 850 F.2d at 596; *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (Abortion "plainly touche[s] on issues of public, rather than private, concern."); *Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 777 (S.D. Ohio 2016) (Pro-life views "(or any views on abortion for that matter) form quintessential speech regarding 'any matter of political, social, or other concern to the community.'"). That Melton used powerful imagery to convey his pro-life message does not detract from the public-concern analysis. *See Rankin*, 483 U.S. at 387.

**B.    Defendants failed to proffer sufficient evidence of actual or likely disruptions to put *Pickering* balancing at issue.**

Because Melton's speech concerns a matter of public concern, the burden shifts to Defendants to demonstrate their interests in "'promoting the efficiency of the public services [they] perform[] through [their] employees.'" *Sexton*, 210 F.3d at 911. Defendants must "proffer sufficient evidence that the speech had an adverse impact on the department" to "put the *Pickering* balancing test at issue." *Id.* Defendants failed to do so in this case.

**1**. Defendants' burden is greater because Melton's pro-life speech is entitled to great weight. *Pickering* sets forth a "uniquely 'particularized' balancing test, not a simple burden-shifting threshold." *Fenico*, 70 F.4th at 162. This approach "takes proportionality

22

into account." *Burnham*, 119 F.3d at 679. "The more the employee's speech reflects matters of public concern, the greater the employer's showing must be that the speech was disruptive before the speech can be punished." *Sexton*, 210 F.3d at 912; *see also Belk*, 228 F.3d at 881 (same). "'[T]he amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public.'" *Fenico*, 70 F.4th at 162; *see also Moser v. Las Vegas Police Dep't*, 984 F.3d 900, 905 (9th Cir. 2021) (noting that *Pickering* establishes a "sliding scale for how much weight to give to a statement of 'public concern'").

As discussed above, Melton's pro-life speech touched on a matter of "great public concern"—abortion. *Johnston*, 850 F.2d at 596; *see also supra* 19-22. The district court, however, failed to give due weight to the nature of the speech at issue, as required under this Court's case law. *See* App.155; R. Doc.36, at 9. It simply noted that abortion is "a divisive issue" and that "[t]he public was interested in Melton's speech." *Id.* But it failed to adjust the sliding scale in Melton's favor given the nature of his speech. This failure infected the district court's assessment of the sufficiency of Defendants' proffered evidence of disruptions. *See* App.152-55; R. Doc.36, at 6-9. Because of this failure, the district court effectively held Defendants to a lower "amount of disruption … to tolerate." *Fenico*, 70 F.4th at 162. This was error. *See Sexton*, 210 F.3d at 912.

Melton's Facebook post was "'entitled to special protection' given [its] contribution to the public political discourse." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 727 (9th Cir. 2022) (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). Accordingly,

Defendants must make a "'greater'" showing of disruption to justify punishing Melton. *Belk*, 228 F.3d at 881.

**2.** Defendants conceded that Melton's speech did not cause any actual disruptions. *See supra* 8. This Court has held that the "government employer must make a substantial showing that the speech is, in fact, disruptive." *Burnham*, 119 F.3d at 680 (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality)). And it must demonstrate "with specificity that the speech created disharmony in the workplace, impeded the plaintiff's ability to perform their duties, or impaired working relationships with other employees." *Sexton*, 210 F.3d at 913. "Mere allegations of disruptions are insufficient." *Id.* at 912. So are "bare allegations that the speech caused the City problems." *Kincade*, 64 F.3d at 398. Nor is it sufficient to proffer "'a simple assertion by the employer that [the] speech affected morale, without supporting evidence.'" *Sexton*, 210 F.3d at 912 (quoting *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994)).

Here, Defendants failed to show that Melton's speech was, "in fact, disruptive" to providing fire services throughout the City. *Burnham*, 119 F.3d at 680. Defendants conceded that Melton's Facebook post did not cause any disruptions to the fire services. App.67; R. Doc.21-3, at 14 (Williams 54:7-11) (Q: "are there any people that were not arrested or fires that were not put out because of the hubbub around this post?" A: "Not to my knowledge."); *see also* App.69; R. Doc.21-3, at 16 (Williams 69:10-15) (Q: "[Y]our testimony is that this didn't … keep any fires from being put out or any arrests from being made or anything like that?" A: "During that time frame, no."

24

Q: "During any time frame?" A: "That I'm aware of, no."). Defendants also conceded that Melton's speech did not affect the fire department's training and operations. App.67; R. Doc.21-3, at 14 (Williams 54:22-25) (Q: "Do you know about any trainings or any operations of the City Fire Department that were disrupted?" A: "Not that I'm aware of.").

Defendants also failed to show that Melton's speech "created disharmony" at the fire department or "impairment working relationships" among the firefighters. *Sexton*, 210 F.3d at 913. It is undisputed that "[n]o co-worker other than Melton's *former* captain complained to [him] about the post." App.155; R. Doc.36, at 9. (emphasis added). And Defendants presented "no evidence of resulting friction among current fire fighters." *Id.*

*Pickering* is a doctrine bottomed on the government employer's unique interests in "promoting the efficiency of the public services performed through its employees." *Pickering*, 391 U.S. at 565. With "no evidence of disruption," *Belk*, 228 F.3d at 881, and no evidence of disharmony at the workplace, *see Sexton*, 210 F.3d at 913, the government usually fails to put *Pickering* balancing at issue. *See, e.g.*, *Burnham*, 119 F.3d at 680 (rejecting the government's allegations of harm as speculative where "no classes were suspended or schedules altered and not a single act of violence occurred on [college] premises" because of the professor's history exhibits); *Shockency v. Ramsey County*, 493 F.3d 941, 950 (8th Cir. 2007) ("Nothing in [the supervisor's] deposition testimony suggests that [the employee's] campaign [for sheriff against the supervisor] disrupted the

25

department's efficiency"); *Kincade*, 64 F.3d at 398 (declining to conduct *Pickering* balancing where the employer "failed to provide even a scintilla of evidence" that the speech "caused disharmony in the workplace"). This is especially true in cases like Melton's where the government's burden is "greater" because of the nature of the speech. *Sexton*, 210 F.3d at 912; *accord Belk*, 228 F.3d at 881 (same).

**3.** Defendants also failed to proffer sufficient evidence to support their prediction of disruptions based on minor occurrences of third parties' misunderstanding of Melton's post. Below, the district court "defer[red]" to Mayor Williams's assertion that Melton's post "*would* cause disruption in the fire department" "[g]iven all the fuss that did occur." App.154; R. Doc.36, at 8 (emphasis added). The court observed that "the law doesn't require actual disruptions" to fire employees. App.153; R. Doc.36, at 7 (citing *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-34 (8th Cir. 2015)). And it effectively gave dispositive weight to fact that, at unspecified times, the Mayor "was fielding media inquiries," Chief Dallas's "phone was blowing up," and some unidentified citizens complained about Melton's post. *Id.*

This conclusion was erroneous.

***First***, although this Court does not require "'[e]vidence of actual disruption … in all cases,'" it does not rubberstamp the government's assertions. *Anzaldua*, 793 F.3d at 833-34. The government still must make a "'reasonable prediction[] of disruption'" in light of the record evidence. *Id.*; *see also Fenico*, 70 F.4th at 166 ("[T]he government must "establish likely disruption through record support."); *Moser*, 984 F.3d at 910

("The question is … not whether [the government] has an abstract interest in avoiding disruption and litigation, but whether, on this record, [it] could reasonably think [the employee's] speech threatened those interests.").

"'[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.'" *Burnham*, 119 F.3d at 679 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969)). While giving "*some* deference to an employer's predictions of workplace disruption," this Court has "never granted any deference to a government supervisor's bald assertions of harm based on conclusory hearsay and rank speculation." *Id.* at 680. Indeed, "'engaging in *Pickering* balancing is not like performing rational basis review, where we uphold government action as long as there is some imaginable legitimate basis for it.'" *Nichols v. Dancer*, 657 F.3d 929, 934 (9th Cir. 2011) (quoting *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004)). "Disruption is always possible, but to give deference to unfounded predictions of harm would allow the government arbitrarily to punish speech under the guides of preempting disruption." *Kinney*, 367 F.3d at 364. The government must offer a "'genuine'" justification, not one "'hypothesized or invented *post hoc* in response to litigation.'" *Kennedy*, 597 U.S. at 543 n.8.

**Second**, no record evidence supports the prediction that Melton's post would "undermine the fire department's cohesion." *Cf.* App.153; R. Doc.36, at 7. Here, Mayor Williams's "investigation" consisted of a perfunctory conversation with Melton, talking to Chief Dallas and *retired* firefighters who no longer work at the fire department, and

27

talking to lawyers and HR personnel. App.148-49; R. Doc.36, at 2-3. And Mayor Williams fired Melton the next morning. *Id.* This rush to judgment is not a reasonable investigation that can support a prediction of disruption. *Cf. Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 474 (5th Cir. 2014). Crucially, this investigation did not produce any evidence that any of Melton's firefighter colleagues misunderstood, and complained about, Melton's post. And even after completing fact discovery, Defendants put forth "no evidence of … friction among current fire fighters." App.155; R. Doc.36, at 9. And "[n]o co-worker … complained to Melton about the post." *Id.*

Melton's case is distinguishable from *Anzaldua* and *Shands*, two cases chiefly cited by the district court. *See* App.153-54; R. Doc.36, at 7-8. In *Anzaldua*, the summary-judgment record showed that the plaintiff sent an email to the newspaper "expressing concerns about the Fire District and about Chief Farwell in particular" and "'angered' many of Anzaldua's co-workers." 793 F.3d at 826, 834. No such evidence exists in Melton's case. And in *Shands*, the trial record supported the prediction of disruptions. There, the fire chief discharged four senior subordinates who "circumvented the chain of command" to meet with a councilmember to raise certain concerns about the chief's decisions. *Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir. 1993). And one of the discharged plaintiffs said he did this to show "'that [the chief] could not have his way about every little thing.'" *Id.* Again, no such evidence exists in Melton's case. Melton simply wanted to share his pro-life views.

Melton's case is instead analogous to *Washington v. Normandy Fire Protection District*, where this Court rejected the government's unsupported prediction of disruption. 272 F.3d 522 (8th Cir. 2001). There, Washington, a firefighter, went on a radio show and "expressed concern about deficiencies in the District's willingness to respond to the needs and concerns of the primarily African-American community it serves." *Id* at 524-25. After a firefighter union steward filed a grievance with the department, alleging Washington created a hostile work environment for white employees, Washington was demoted and then terminated. *Id.* at 525.

At summary judgment, the department's directors relied on *Shands* for the proposition that "no showing of actual disruption [was] necessary." *Id.* at 527. But this Court rejected the directors' argument because "*Shands* … point[ed] out that the fire chief in that case reasonably believed that the speech in question had led or would lead to disruption within the department." *Id.* This "showing … [was] absent in this case." *Id.* "In the absence of such a showing," this Court held that "Washington's speech may not be punished," reversed the district court's grant of summary judgment in the government's favor, and remanded. *Id.* (citing *Sexton*, 210 F.3d 913). Likewise, the district court incorrectly deferred to Mayor Williams's unsupported prediction that Melton's post "would undermine the fire department's cohesion." App.153; R. Doc.36, at 7; *see Washington*, 272 F.3d at 527.

**Third**, receiving a media request and citizen complaints based on the misunderstanding of Melton's posts do not support Mayor Williams's prediction.

29

To start, contrary to the district court's observation, that "[t]he Mayor was fielding media inquiries" does not support the prediction of disruptions to the fire department. App.153; R. Doc.36, at 7. Media attention is not always evidence of disruption or a reason to fire an employee. *Pickering* itself was a case involving "a local newspaper" which publicized a teacher's letter "attack[ing]" the school board. 391 U.S. at 564-56. The Supreme Court nevertheless ruled in the teacher's favor. *Id.* at 574-75. And this Court also explained that being "'upset that the City was in the news'" is insufficient to show adverse effect on the government's efficiency. *Sexton*, 210 F.3d at 912; *see also Riley's*, 32 F.4th 727 (similar). Other than vaguely stating that he received "a media request," Mayor Williams failed to show that the media coverage was so extensive and negative that he needed to fire Melton. App.125; R. Doc.24-10, at 9 (Williams 34:12); *see also Riley's*, 32 F.4th 727; *cf. Locurto v. Giuliani*, 447 F.3d 159, 180 (2d Cir. 2006) ("extensive" media coverage supported firing employees). Such "vague and conclusory statements" are not enough. *Sexton*, 210 F.3d at 912-13. In any event, Mayor Williams testified that he was not aware of "any other media coverage … since the beginning." App.135; R. Doc.24-10, at 19 (Williams 72:3-7).

To the extent that there was any pre-firing coverage, City officials were the ones who made it worse: Although the timing is unclear, according to Mayor Williams, it was the "council members" who were "doing TV broadcasts out in the parking lot of City Hall." App.130; R. Doc.24-10, at 14 (Williams 53:18-54:11). And the widely publicized news coverage by Channel 3 came *after* Defendants fired Melton, and Mayor Williams

Appellate Case: 23-3398    Page: 40    Date Filed: 01/25/2024 Entry ID: 5356956

fed the story of his firing to Channel 3. *Supra* 7. Without the City officials' own public-relations offensive, the "chance" that the rest of the public would see Melton's post, *potentially* misunderstand its meaning, and take offense "remained low" because Melton "deleted" the post within minutes after his phone call with Dale. *Moser*, 984 F.3d at 910. Melton cannot be faulted for any attention drawn to, or further controversy created by, his deleted Facebook post because of the City officials' own media campaign. *See Kinney*, 367 F.3d at 364 ("The question is whether the plaintiffs' [speech] posed a threat to the Police Officials' ability to deliver police services, not whether the Police Officials caused a disruption in response to it."); *cf.* App.154; R. Doc.36, at 8 (faulting Melton for all the "fuss that did occur").

Nor does the fact that some unidentified citizens contacted the Mayor about Melton's post establish a reasonable prediction of disruptions. That "'some citizens' … express[ed] outrage" or "concern" in response to an employee's speech is, by itself, not sufficient without some other evidence that the speech "damaged the reputation of the department or affected the department's efficiency." *Sexton*, 210 F.3d at 913; *see also Lindsey v. City of Orrick*, 491 F.3d 892, 900 (8th Cir. 2007) (although the employee's speech caused city council members to dislike him, "this is not enough to show … such dislike impaired his working relationship with these individuals"); *cf. Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767 (9th Cir. 2022) (insufficient to show that co-workers were "'hurt,' 'upset,' 'furious,' and 'outraged' … [where] there were no evidence of 'actual injury to the department'").

31

Here, Mayor Williams's testimony regarding these calls is too vague. For instance, Mayor Williams failed to explain whether those citizens complained because they were pro-choice and disagreed with Melton's pro-life message; because they misunderstood the meaning of the picture like Dale; or because of some other reason. *See* App.135-36; R. Doc.24-10, at 19-20 (Williams 74:25-76:12). The "nature of those complaints" matter, and it was Defendants' burden to present sufficient evidence. *Riley's*, 32 F.4th at 727; *see also Sexton*, 210 F.3d at 921. They failed to do so.

At best, these were "minor occurrences" of unidentified individuals asking the Mayor to not send Melton on emergency calls. *Riley's*, 32 F.4th at 727. These minor occurrences are "far afield from cases where the government gave weight to hundreds of parent and student complaints" and thus insufficient to demonstrate "likely future disruption." *Id.*; *cf. Melzer, Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 336 F.3d 185, 190-91 (2d Cir. 2003) (60 parents and hundreds of students); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 473-74 (3d Cir. 2015) (hundreds of parents).

There are good reasons for requiring more than "outrage" from "'some citizens'" before allowing the government to punish employees for their speech. *Sexton*, 210 F.3d at 913; *see also Burnham*, 119 F.3d at 672-73, 680. The "community reaction cannot dictate whether an employee's constitutional rights are protected" in all cases. *Melzer*, 336 F.3d at 199. Though *Pickering* teaches that the government employer's unique interests in providing services should be considered, it does not sanction an outright heckler's veto—especially based on misunderstanding about the meaning of the speech and when

Appellate Case: 23-3398     Page: 42     Date Filed: 01/25/2024 Entry ID: 5356956

there's been no effect on efficiency. *See, e.g.*, *Bennett v. Metro. Gov't of Nashville*, 977 F.3d 530, 554 (6th Cir. 2020) (Murphy, J., concurring in the judgment) (it's "unclear how much [*Pickering*] balancing 'constitutionaliz[es] a heckler's veto'"). To adequately balance the employee's First Amendment interests—which he does not "relinquish"—in the *Pickering* analysis, 391 U.S. at 568, the employee's "protected speech" should not "readily give way to a 'heckler's veto,'" *Kennedy*, 597 U.S. at 543 n.8. Otherwise, *all* Americans would be worse off, regardless of what their beliefs are, as they would be susceptible to having to decide between their jobs and their speech, based simply on a handful of complaints. *See, e.g.*, *Fuller v. Warren Cnty. Educ. Serv. Ctr.*, 2022 WL 445815, at *1-2 (S.D. Ohio Feb. 14, 2022) (employees disciplined for wearing face masks that said "Black Lives Matter," "I Can't Breathe," "Unapologetically Black," and "Down With Racism" after the employer received complaints); *Bennett*, 977 F.3d at 554 (Murphy, J., concurring in the judgment) ("How about if an employee's decision to kneel during the national anthem … garnered significant complaints?").

This danger is accentuated because of the proliferation of social media, which sometimes enables—if not encourages—"cancelling" people for their speech. But "[t]he advent of social media does not … provide a pretext for shutting off meaningful discussion of larger public issues in the new public sphere." *Liverman v. City of Petersburg*, 844 F.3d 400, 414 (4th Cir. 2016). And "[t]he fear of 'going viral,' by itself" is not "a reasonable justification for a restriction on an employee's speech." *Goza v. Memphis Light, Gas & Water Div.*, 398 F. Supp. 3d 303, 321 (W.D. Tenn. 2019).

33

In response, Defendants *might* say that they needed to punish Melton to "'instill public confidence'" in the fire department because some people misunderstood Melton's Facebook post to convey a racially insensitive message. R.7, at 7. But the controversy surrounding Melton's speech was vastly different—both in kind and degree—from the cases where courts deferred to the government for firing employees who *intended* racist speech. *See, e.g.*, *Locurto*, 447 F.3d at 183 (a parade by police officers and firefighters with racist lampooning with extensive media coverage); *McMullen v. Carson*, 754 F.2d 936, 936-37 (11th Cir. 1985) (a city clerk who publicly identified as a KKK recruiter). Melton's was a pro-life post. There were only "minor occurrences" of misunderstanding about its meaning. *Riley's*, 32 F.4th at 727. Melton was apologetic when he learned that he offended others. App.57; R. Doc.21-3, at 4 (Williams 24:3-11).

Besides, any misunderstanding about the Facebook post's meaning was unlikely to spread beyond those individuals because Melton deleted the Facebook post. *See* App.108; R. Doc.24-3, at 12 (Melton 46:24-47:3); *Moser*, 984 F.3d at 910. And such misunderstanding could have easily been dispelled through follow-up conversations with those individuals who called or through the media and press releases, without terminating Melton. *Cf. Pickering*, 391 U.S. at 572 ("The Board could easily have rebutted appellant's errors by publishing the accurate figures itself, either via a letter to the same newspaper or otherwise."). Ultimately, the employee's First Amendment rights should not turn entirely on *some third parties'* subjective, mistaken belief about the meaning of the employee's speech.

34

Moreover, on this record, Defendants' public-perception concerns are significantly diminished because Mayor Williams testified that he is open to considering having Melton back as a firefighter. App.135; R. Doc.24-10 (Williams 72:10-15). Melton also currently serves the public as a sheriff's deputy for St. Francis County without any indication that the public's confidence in the Sheriff's Department has been weakened. App.98-99; R. Doc.24-3, at 2-3 (Melton 7:21-8:12).

\* \* \*

Defendants failed to put *Pickering* balancing at issue as a matter of law. The Court should grant summary judgment in Melton's favor.

## C. Even under *Pickering* balancing, Melton's interests significantly outweigh Defendants' interests.

Even if the Court were to agree that Defendants proffered sufficient evidence of likely disruptions, Defendants still do not win. When the Court proceeds to *Pickering* balancing, it weighs the following factors: (1) the need for harmony in the workplace; (2) the closeness of the working relationship between the plaintiff and his co-workers and the potential impact that the speech in question might have on that relationship; (3) the time, place, and manner of his speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech interfered with appellant's ability to perform his duties. *Belk*, 228 F.3d at 880. This balancing test is "flexible," and "the weight to be given to any factor varies depending on the circumstances of the case." *Anzaldua*, 793 F.3d at 835. Melton prevails under balancing.

35

***Degree of public interest in the speech***. This factor heavily favors Melton. Melton's Facebook post concerned abortion, which is "'at the center of public debate.'" *Id.* (quoting *Shands*, 993 F.2d at 1346). Even under balancing, Melton's speech is entitled to "'greater'" weight. *Sexton*, 210 F.3d at 913. Again, although the district court recognized that the public was interested in Melton's speech, it failed to give it more weight. *See supra* 23. Even without this calibration, the district court thought *Pickering* balancing was "close." App.155; R. Doc.36, at 9. If this Court were to give proper weight to Melton's speech, he comes out ahead without question.

***Time, place, and manner of the speech.*** This factor also favors Melton. Melton made his post on his own personal account out outside of work. Courts "give less weight to the government's concerns about the disruptive impact of speech outside the workplace context." *Riley's*, 32 F.4th at 726; *see also Rankin*, 483 U.S. at 388 & n.13.

Melton intended to convey a strong message that he is against abortion and that when "you kill the baby, they can't breath[e] anymore." App.109; R. Doc.24-3, at 13 (Melton 51:21-24). Melton's speech did not criticize or undermine his superiors or his co-workers. *Supra* 4; *cf. Shands*, 993 F.3d at 1345. To be sure, there were minor occurrences of people misunderstanding what Melton meant with his post. *Supra* 8. Melton could have ignored these concerns, but he didn't. He spoke with Dale about the meaning of his post, and later, promptly deleted the post out of respect for Dale when he learned that his Facebook post could be misinterpreted. *Supra* 5.

***Need for harmony & Closeness of the working relationship.*** These factors heavily favor Melton as well. Melton does not dispute that the fire department requires a close working relationship among the firefighters. Here, however, Defendants produced *no evidence* that Melton's speech caused any disharmony among his colleagues. It is undisputed that "[n]o co-worker"—other than Melton's *former* captain who no longer worked at the fire department—"complained to [him] about the post." App.155; R. Doc.36, at 9. And Defendants presented "no evidence of resulting friction among current fire fighters." *Id.* This factor is significant. *See Washington*, 272 F.3d at 525 (complaint by a firefighter union steward was insufficient).

Even if the former captain's complaint is relevant, Melton's interactions with him show that he was able to preserve the harmony and closeness of the working relationship. He respectfully explained the meaning of his post and then deleted the post after learning that the former captain misunderstood the post and took offense. *Supra* 5.

***Whether the speech hindered Melton's ability to perform his duties.*** This factor also heavily favors Melton. Defendants conceded that the fire department's ability to put out fires, conduct trainings, and carry out its operations was not affected by Melton's speech. *See supra* 24-26; *see, e.g.*, *Burnham*, 119 F.3d at 680; *Shockency*, 493 F.3d at 950; *Kincade*, 64 F.3d at 398. *Pickering* is a doctrine that furthers "the efficiency of the public services performed through its employees." 391 U.S. at 565. The fact that the City's ability to provide fire services was not affected, despite some minor occurrences

37

of misunderstanding regarding Melton's post, should weigh significantly in Melton's favor.

The district court's conclusion that "[t]he calls from residents … show[ed] that the public's trust in Melton as a Forrest City firefighter was eroding" is unfounded for the reasons above. App.155; R. Doc.36, at 9; *supra* 24-29. This conclusion is further undermined by the fact that Mayor Williams is open to considering having Melton back as a firefighter. *Supra* 10. Moreover, St. Francis County hired Melton back as a sheriff's deputy months after his departure from the fire department. *Id.* As part of his job, Melton comes into regular contact with the public. *Id.* These facts show that Melton's ability to serve the public without hinderance despite any misunderstanding about the Facebook post.

***Context in which the dispute arose***. The overall context in which the dispute arose also favors Melton. Importantly, the controversy arose because of minor occurrences of misunderstanding about the meaning of his Facebook post. Moreover, Melton deleted the pro-life Facebook post within minutes of learning that others had misinterpreted its meaning. For that reason, before the firing and Channel 3 news coverage, the likelihood that people (other than the handful of unidentified individuals who already complained to Mayor Williams) would see the post was "low." *Moser*, 984 F.3d at 910.

There was no personnel policy prohibiting Melton from having a social media account or even explaining what he could or couldn't post as a City employee. *See*

*supra* 6. Melton tried to explain his post to Mayor Williams during their meeting and in his subsequent grievance and appeal letters. *Supra* 6-7, 9. Mayor Williams's investigation largely consisted of talking to two former firefighters, lawyers, and HR personnel; within less than a day, the Mayor fired Melton. *Supra* 7. But Defendants presented no evidence that the current firefighters saw, misunderstood, and were offended by the post. And Defendants conceded that the fire department's services were not disrupted. Melton found out about his firing through Channel 3, which failed to report his side of the story and caused significant criticism against him. Mayor Williams reviewed and upheld his own termination decision after receiving Melton's grievance letter and didn't even respond to Melton's appeal letter.

Although Mayor Williams vaguely testified about "a media request" regarding Melton's post, the City's Councilmembers were, in part, driving the media attention. Although "some citizens" called and asked him not to send Melton on emergency calls, these were minor occurrences regarding Melton's post that that do not support the prediction of disruptions.

### D.    Alternatively, the district court should have submitted the factual predicates to *Pickering* balancing to the jury.

If the Court disagrees with Melton's contention that he should win at the second step's threshold inquiry, it should, at a minimum, vacate the district court's order and remand with the instruction to submit the question to the jury.

Appellate Case: 23-3398    Page: 49    Date Filed: 01/25/2024 Entry ID: 5356956

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only if there is "no genuine dispute as to any material fact." This Court views the record evidence in the non-movant's favor. Filing cross-motions for summary judgment—as the parties have done here—does not change this rule. "Where the litigants concurrently pursue summary judgment, each motion must be evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001) (citing *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211 (8th Cir. 1983)); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) ("When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion.").

Whether the employee's speech involved a matter of public concern and whether *Pickering* balancing favors the government are "questions of law for the court to decide." *Belk*, 228 F.3d at 878. "Any underlying factual disputes, however, are properly submitted to the jury through special interrogatories or special verdict forms." *Id.*; *Shands*, 993 F.2d at 1342 ("the jury should decide factual questions such as … whether the speech created disharmony in the work place"); *Moser*, 984 F.3d at 902 ("whether [the employee's] comment would have likely caused disruption in the police department" is a factual dispute).

Appellate Case: 23-3398    Page: 50    Date Filed: 01/25/2024 Entry ID: 5356956

For purposes of evaluating Defendants' summary-judgment motion, the evidence must be viewed in the light most favorable to Melton. As explained, it is factually undisputed that Melton's Facebook post did not cause any disruptions to the fire department's services or create disharmony among the firefighters. At a minimum, there exists a genuine dispute of material fact as to whether Defendants reasonably believed that Melton's speech would lead to disruptions based on minor occurrences of misunderstanding regarding Melton's post. *See Washington*, 272 F.3d at 527. Such fact questions should have precluded judgment as a matter of law. And they must be "resolved before the court could weigh the competing considerations under the *Pickering* balancing test." *Moser*, 984 F.3d at 902.

## II. Melton is entitled to summary judgment on his unbridled-discretion claim.

Melton is entitled to summary judgment also because he was fired under an unwritten policy that gives unbridled discretion to city officials to scrutinize city employees' speech on a case-by-case basis. Maintaining such a speech regulation violates the First Amendment.

### A. Defendants conceded that the Mayor enforces an unwritten policy of scrutinizing employee speech for egregiousness on a case-by-case basis.

Defendants conceded that they have an unwritten speech policy. Whether a policy is written or unwritten is immaterial under §1983. "[U]nwritten" policies that violate the Constitution are subject to being challenged just the same as written policies. *Meier v. City of St. Louis, Mo.*, 934 F.3d 824, 828 (8th Cir. 2019); *see also Jones v. Salt Lake County*,

503 F.3d 1147, 1163 n.13 (10th Cir. 2007) (That a policy is "unwritten and unpublicized

is irrelevant to our analysis."); *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 616

(E.D. Pa. 2014) ("The right to challenge a policy under the First Amendment is the

same whether the policy is written or not."), *aff'd* 834 F.3d 435 (3d Cir. 2016).

The City's written social media and personal policy manuals "do[] not address

what [an employee] can or can't post." App.61; R. Doc.21-3, at 8 (Williams 29:6-16);

App.70-71; R. Doc.21-3, at 17-18 (Williams 70:17-71:3). Nevertheless, Mayor Williams

confirmed the existence of unwritten rules: Employees can be fired if they post content

that is of an "egregious nature." App.60; R. Doc.21-3, at 7 (Williams 28:13). When

Mayor Williams was asked about the existence of "any unwritten rules," he did not deny

their existence. App.61-62; R. Doc.21-3, at 8-9 (Williams 29:17-30:25). Instead, he

merely noted that it is "hard for [him] to speak to unwritten rules" but confirmed that

"there is a responsibility when you are … an employee of the City of Forrest City." *Id.*

Mayor Williams further confirmed that he would "take each … Facebook post

under merit" on a case-by case basis. *Id.*

In his deposition, Mayor Williams also had the following exchanges:

Q: So from your perspective, does an employee have the right to post
something controversial on their Facebook page …?
A: They have the right, yes.
Q: Okay. Subject to your decision to terminate?
A: Depends on … each is a case-by-case scenario.
Q: Okay, so—
A: If that post comes to an egregious in nature – that [a]ffects the func-
tionality of the City –
Q: So if it's unpopular enough and causes enough calls in, then it may be

42

something that they can be terminated for?

A: When you say "unpopular," it just depends on the nature.

App.130-31; R. Doc.24-10, at 14-15 (Williams 55:22-56:8).

> Q: You keep saying that it's a case-by-case basis. So my question is, from your perspective, you just have unbridled discretion on what constitutes a termination or doesn't?

> A: And, again, I say on a case-by-case basis. If it arises to the nature of this one here, I'd have to look at it and see if it, again, was as egregious in nature as this one here.

App.70-71; R. Doc.21-3, at 17-18 (Williams 70:22-71:3).

*NAACP v. City of Philadelphia* is directly on point. There, a district court found that an airport maintained an "unwritten policy that prohibits the display of advertisements deemed inconsistent with the airport's mission" based on similar deposition exchanges. 39 F. Supp. 3d at 630. The airport's CEO "confirm[ed] that commercial advertisements that could be viewed as 'offensive' receive extra scrutiny before they are approved" even though the written policies did not include such steps. *Id.* at 633. The unwritten policy was unconstitutional because it engaged in "viewpoint discrimination." *Id.* at 634. Like the airport's CEO, Mayor Williams confirmed that he would look at employees' posts on a case-by-case basis, even seemingly preferring the "case-by-case scenario" to "having objective standards" for employees. App.132; R. Doc.24-10, at 16 (Williams 60:14-61:2).

## B. Defendants' unwritten policy prohibiting egregious social media posts gives unbridled discretion to censor and punish speech.

A speech policy violates the First Amendment if it "delegate[s] unbridled

43

discretion to the government officials entrusted to enforce the regulation." *Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir. 2001). To be constitutional, a speech policy must "be specific enough" so as to cabin the government official's exercise of discretion. *Id.*

The reason for prohibiting standardless speech regulations is obvious: "'[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship.'" *Roach v. Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009) (quoting *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988)). "'This danger'" of content and viewpoint censorship is "'at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.'" *Id.* To prevail on "'a facial challenge on [this] ground[],'" the plaintiff does not need show that the government official "'has exercised his discretion in a content-based manner.'" *Lewis*, 253 F.3d at 1080. Instead, the plaintiff prevails if there is nothing in the challenged policy that "'prevent[s] him from doing so.'" *Id.*; *accord Roach*, 560 F.3d at 869.

Applying this principle, this Court has held that a Missouri law allowing the government to reject vanity license plates if they are "contrary to public policy" was unconstitutional. *Lewis*, 253 F.3d at 1080. In the Court's view, this language was so broad and gave "nearly unfettered discretion" to the government to decide what message was and was not "contrary to public policy." *Id.* There, the inquiry wasn't whether the plaintiff's requested license plate ("ARYAN-1") was denied "because of her viewpoint" but "'whether there [was] anything in the ordinance preventing [the government] from

44

doing so.'" *Id.* Subsequently, this Court also said that a different Missouri law that gives the government the authority to "approve or deny specialty license plate applications" with "no standards or guidelines" was also unconstitutional. *Roach*, 560 F.3d at 869. The plaintiff did not need to prove that the plaintiff's plates ("Choose Life") were denied "based on Choose Life's viewpoint." *Id.* The inquiry, again, was whether anything prevented the government from doing so. *Id.*

Similarly, the court in *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1301-02 (N.D. Ga. 2017), dealt with a speech policy for firefighters. There, the plaintiff was disciplined for violating the city's pre-clearance policy requiring firefighters to obtain permission "prior to writing and publishing [books]." *Id.* at 1285. The court held that this policy was unconstitutional because it did "not define any standards for the [government] to apply." *Id.* at 1301.

Here, Melton should prevail on his facial challenge to Defendants' unwritten speech policy. Mayor Williams was never able to articulate what "egregious" means or what kind of social media posts would be considered egregious. The only feature of this policy is that Mayor Williams would review each social media post, on a case-by-case basis, and then decide whether that social media post was "egregious." *See supra* 42-43; *see also* App.131; R. Doc.24-10, at 15 (Williams 57:22-23) ("I would have to review the Facebook post to make a judgment."). And there is nothing that prevents Mayor Williams from applying the "egregiousness" standard in a content- and viewpoint-discriminatory manner. For example, during his deposition, Mayor Williams testified that he is

Appellate Case: 23-3398    Page: 55    Date Filed: 01/25/2024 Entry ID: 5356956

personally pro-choice. App.130; R.24-10, at 14 (Williams 53:6-9). But there is nothing in his articulation of the "egregiousness" standard that would prevent him from deeming pro-life speech to be egregious. And Melton does not need to show that Mayor Williams did or would apply the policy in such manner; he only needs to show that nothing "'prevent[s] him from doing so.'" *Lewis*, 253 F.3d at 1080.

The district court nevertheless rejected this claim, stating that Melton "hasn't met his burden of showing a real and substantial deterrent effect on protected expressions." App.150; R. Doc.36, at 4. But this misses the point. The deterrent effect of a standardless policy that gives unfettered discretion to government officials censor and punish speech is obvious. The First Amendment prohibits unbridled discretion because "'[w]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.'" *Roach*, 560 F.3d at 869; *see also Lewis*, 253 F.3d at 1080 ("Without such standards, every application of the [standardless] regulation 'creates an impermissible risk of suppression of ideas'" (quoting *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). That's why this Court examines the speech policy itself, not how it is being applied.

For these reasons, the Court should grant summary judgment as to the unbridled-discretion claim in Melton's favor.

Appellate Case: 23-3398    Page: 56    Date Filed: 01/25/2024 Entry ID: 5356956

### III. Neither the City nor Mayor Williams can escape liability for money damages or equitable relief.

Melton seeks both injunctive relief and money damages against both the City and Mayor Williams, in both individual and official capacities. Neither qualified immunity nor municipal-liability doctrine precludes Melton's entitlement to relief.

#### A. Mayor Williams does not enjoy qualified immunity.

Mayor Williams does not enjoy qualified immunity from Melton's claims. The district court held that Mayor Williams was "entitled to qualified immunity" from damages because "Melton's speech wasn't protected." App155-56; R. Doc.36, at 9-10. However, if this Court reverses after holding Melton's speech is protected, it should likewise reverse the district court's holding on qualified immunity. *See, e.g., Shockency*, 493 F.3d at 950.

#### B. The City is liable for Mayor Williams's actions.

The City also cannot escape liability in this case. Mayor Williams's actions are attributable to the City because he was its final policymaker. The City is thus liable for injunctive relief and damages. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

"Municipalities … may be held liable under §1983 only if the alleged constitutional violation was caused by an 'action pursuant to official municipal policy of some nature.'" *Meier*, 934 F.3d at 828. Such policy can be "'unwritten.'" *Id.* "An unconstitutional governmental policy can be inferred from a single decision taken by the highest official responsible for setting policy in that area of the government's business." *Angarita v. St. Louis County*, 981 F.2d 1537, 1546 (8th Cir. 1992). Thus, "[m]unicipal officials

47

who have final policymaking authority may, by their actions, subject the government to Section 1983 liability." *Id.*; *see also Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) ("It does not matter that the final policymaker may have subjected only one person to only one unconstitutional action.").

Here, the district court erred in holding that "the claims against the city and the … official capacity claims against Mayor Williams fail." App.149; R. Doc.36, at 3. The district court incorrectly held that there was "no evidence in the record of a Forrest City policy or a custom with the force of law about controversial speech by city employees." *Id.* The City's unconstitutional governmental policy can be inferred from Mayor Williams' "single decision" to fire Melton. *Angarita*, 981 F.2d at 1546.

This is because Mayor Williams is the final policymaking authority for personnel matters in the City, for purposes of municipal-liability analysis. The final policymaker can be identified by consulting "'state and local positive law'" and "'state and local custom or usage having the force of law.'" *Sotecz v. Rushmore Plaza Civc Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017); *see also Williams v. Butler*, 863 F.2d 1398, 1401 (8th Cir. 1988) (examining state law to determine whether the official possesses "final policymaking authority in the area in which the challenged conduct occurred."). Here, Mayor Williams was the final policymaker for the City as to both (1) promulgating personnel policies for City employees and (2) enforcing personnel policy handbook to ensure City employees' compliance.

By statute, Mayor Williams is the "chief executive officer" for the City. Ark. Stat.

Ann. §14-43-504(a). He is responsible for "[s]upervising the conduct of all officers of the city, examin[ing] the grounds of all reasonable complaints made against them, and caus[ing] all their violations of duty or other neglect to be properly punished." *Id.* §14-43-504(b). The Arkansas Attorney General has opined that "the mayor is charged with supervisory authority over city employees, including policemen and firemen, and he bears ultimate power and responsibility to enforce the rules governing day-to-day operations." Ark.-A.G. Op. No. 2002-206, 2002 WL 2005942, at *1 (Aug. 22, 2002).

Consistent with this statutory authority, Mayor Williams testified that he "ultimately sign[s] off" after the City Council proposes "changes … regarding the personnel policy." App.127; R. Doc.24-10, at 11 (Williams 42:2-15). Because Mayor Williams is the City's final policymaker for promulgating personnel policies, the City is liable for Mayor Williams's maintenance of the unwritten social media policy. To be sure, a different provision of Arkansas law gives the power to "promulgate the rules necessary to govern a fire department" to a city council. Ark. Stat. Ann. §14-53-101(b)-(c). However, this provision does not preclude a mayor's ability to promulgate city-wide policies that apply to all city employees, including firefighters. While a city council may be the final policymaker for a specific fire department policy, a mayor could simultaneously be the final policymaker for a city-wide employee policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("municipalities often spread policymaking authority among various officers and officials").

Also consistent with the statutory authority, Mayor Williams testified that he is

49

"ultimately" responsible for "making sure that employees follow the personnel hand-book." App.64; R. Doc.21-3, at 11 (Williams 41:15-22). "[T]he buck stops" with him in enforcing the City's personnel policies. *Id.* Because Mayor Williams is the final poli-cymaker as to enforcing the City's personnel policies, the City is liable for his decision to fire Melton for his pro-life Facebook post.

It does not matter that Forrest City ordinance purports to give the fire chief the "sole authority … to hire and fire personnel" in the fire department. Forrest City Ord. §2-23. Cities cannot "pass any laws contrary to the general laws of the state." Ark. Const. art. 12, §4. Thus, the Forrest City ordinance cannot eliminate the mayor's statu-tory authority to enforce compliance with personnel policies, including by firing a fire-fighter who violates the city-wide policies. And it also does not matter that the Forrest City Council reserved the right to review the *police or fire chief's* decisions to "hire and fire" personnel that "aggrieve[]" a person. Forrest City Ord. §2-24. This ordinance does not give the City Council any role in reviewing firing decisions made directly by the Mayor. *See id.*; *see also* Ark.-A.G. Op. No. 2012-084, 2012 WL 3078118, at *2 (July 25, 2012) ("absent such an ordinance, a city council likely lacks authority to intervene in disciplining of a subordinate officers within the police department …, particularly given the mayor's clear statutory authority to direct the department"). Under Arkansas law and Forrest City ordinance, Mayor Williams is the final policymaker for making firing decisions for violations of city-wide personnel policies.

For all these reasons, Mayor Williams was the City's final policymaker for

promulgating city-wide personnel policy and for deciding to fire employees who violate those city-wide policies. The City is thus liable for Mayor Williams's decision to fire Melton for his pro-life Facebook post and his adoption of unwritten social media policies.

## CONCLUSION

This Court should reverse the district court's order granting summary judgment for Defendants, grant summary judgment in Melton's favor, and remand for further proceedings. Alternatively, this Court should vacate and remand to the extent that it concludes that there are remaining factual disputes that should be submitted to the jury.

January 25, 2024

David R. Hogue
Chris Corbitt
HOGUE & CORBITT
700 S. German Lane, Suite 104
Conway, AR 72034
(501) 255-0112
dh@hoguecorbittward.com
chris@hoguecorbittward.com

Respectfully submitted,

/s/ Frank H. Chang
J. Michael Connolly
Frank H. Chang*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
frank@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia

51

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 12,545 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

The electronic version of the brief and addendum have been scanned for viruses and are free of viruses.

Dated: January 25, 2024                    _/s/ Frank H. Chang_

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: January 25, 2024                    _/s/ Frank H. Chang_

Appellate Case: 23-3398    Page: 62    Date Filed: 01/25/2024 Entry ID: 5356956